**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH A. ROTUNNO, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:20-cv-02357-ER |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | <u>JURY TRIAL DEMANDED</u> |
| DAVID M. WOOD, KERI CROWELL, and QUENTIN R. HICKS, | |
| Defendants. | |

**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox
Donald R. Hall
Jeffrey P. Campisi
Pamela A. Mayer
Jason A. Uris
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

*Lead Counsel for Lead Plaintiff and the Proposed Class*

July 7, 2021

# TABLE OF CONTENTS

**Page(s)**

I.  SUMMARY OF THE CASE ................................................................. 1

II.  NATURE OF THE ACTION ............................................................... 4

III.  JURISDICTION AND VENUE ........................................................... 11

IV.  PARTIES .......................................................................................... 12

V.  RELEVANT NONPARTY .................................................................. 13

VI.  SUBSTANTIVE ALLEGATIONS ..................................................... 14

    A.  Background ............................................................................. 14

    B.  The SEC Required Defendants to Design Policies and Procedures for Effective Internal Control over Financial Reporting ............................................. 14

    C.  The SEC Required Defendants to Maintain Effective Disclosure Controls and Procedures ................................................. 16

    D.  Defendants Were Required to Issue Financial Statements in Compliance with GAAP and SEC Accounting Rules and Regulations ................................ 16

    E.  Defendants Admit to Making False Financial Statements, to Internal Control Deficiencies, and to Issuing False Financial Statements ......................... 19

    F.  Defendants Had Motive and Opportunity to Commit Fraud ............................... 27

VII.  DEFENDANTS CAUSED GULFPORT TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ..................... 33

    A.  Defendants Wood and Crowell Made Materially False and Misleading Statements, and Omitted to Disclose Material Facts That They Had a Duty to Disclose in Gulfport's Q1 2019 10-Q ....................................... 34

    B.  Defendants Wood and Crowell Made Materially False and Misleading Statements, and Omitted to Disclose Material Facts That They Had a Duty to Disclose in Gulfport's Q2 2019 10-Q ....................................... 38

    C.  Defendants Wood and Hicks Made Materially False and Misleading Statements, and Omitted to Disclose Material Facts That They Had a Duty to Disclose Concerning Gulfport's Q3 2019 Financial Results ................. 40

    D.  The Truth Begins to Emerge ................................................... 45

i

VIII.   LOSS CAUSATION/ECONOMIC LOSS ....................................................... 46

IX.   ADDITIONAL SCIENTER ALLEGATIONS ................................................. 46

    A.   Defendants Turned a Blind Eye to Red Flags, Which Supports an
        Inference of Scienter ................................................................................ 47

    B.   Gulfport and Defendant Crowell's Other False Statements to Investors,
        Accounting Violations and Deficiencies in Internal Control over
        Financial Reporting Support an Inference of Scienter.......................... 49

    C.   Defendants Had Motive and Opportunity to Conceal Gulfport's
        Deficiencies in Internal Control over Financial Reporting and to Issue
        False Financial Reports ........................................................................... 51

X.   NO SAFE HARBOR ....................................................................................... 52

XI.   PLAINTIFF'S CLASS ACTION ALLEGATIONS......................................... 52

    COUNT I  (Violations of Section 10(b) of the Exchange Act and Rule 10b-5
    Promulgated Thereunder Against All Defendants)............................................. 55

    COUNT II   (Violations of Section 20(a) of the Exchange Act Against All
    Defendants) ......................................................................................................... 58

XII.   PRAYER FOR RELIEF ................................................................................. 60

XIII.   DEMAND FOR TRIAL BY JURY .............................................................. 60

Lead Plaintiff Joseph A. Rotunno ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Gulfport Energy Corporation's ("Gulfport" or the "Company") public documents, conference calls and announcements made by Gulfport or Defendants (defined below), Gulfport's United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, reports and advisories about the Company, and publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Gulfport's common stock. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     SUMMARY OF THE CASE

1.      During the Class Period (May 3, 2019 through February 27, 2020), Gulfport was an oil and gas producer whose most significant asset was its oil and gas properties. The accurate accounting of the assets that Defendants reported in Gulfport's financial statements was critical for investors to properly evaluate the Company's financial condition, results of operations and business prospects, and market price of its shares.

2.      During the Class Period, on at least a quarterly basis, Gulfport management, including Defendants, conducted an asset impairment test, called the "ceiling test", to determine the proper carrying value of Gulfport's oil and gas assets that Defendants reported in Gulfport's financial statements.

3.      The ceiling test concept is not complex. The ceiling test, in essence, compares the carrying value of Gulfport's oil and gas properties, which are recorded on its balance sheet as an

asset, to estimated future revenues produced from these assets.  If carrying value exceeds estimated future revenues, then Gulfport's oil and gas assets are impaired and must be written down.

4.      In order to conduct a ceiling test that produces a reliable result, among other things, Defendants had to accurately account for costs of Gulfport's oil and gas properties.  Due to internal control deficiencies that plagued Gulfport during the Class Period, Defendants knowingly, or at least recklessly, failed to reconcile the cost of oil and gas properties used in preparing the ceiling test analysis to the amounts recorded in its general ledger (the source accounting book and record used to prepare its financial statements, and a basic accounting procedure of reconciling accounts) to which Defendants (defined below) as the most senior executives of the Company had access. The reconciliation of supporting records to the general ledger is not a sophisticated, complex concept or process—it's Accounting 101.  As a result of Defendants' intentional, or at least reckless conduct, they caused Gulfport to materially overstate the carrying value of Gulfport's oil and gas assets and report materially false and misleading financial results for the quarter ended September 30, 2019.

5.      Defendants had motive and opportunity to cover up Gulfport's materially defective internal controls and to materially understate its oil and gas asset impairment.  Before and during the Class Period, activist Gulfport shareholders, Firefly Value Partners, LP ("Firefly"), and Shah Capital publicly expressed concern about Gulfport's board and management, which included Defendants, and Gulfport's stock price underperformance.  Due to Defendants' and Gulfport's management's unwillingness to commit to actions to maximize value for Gulfport shareholders, these activist shareholders threatened to replace Defendants and Gulfport management.

6.      In light of the threats and pressure exerted by Firefly and Shah Capital, Defendants were motivated to conceal Gulfport's material weakness in internal control over financial reporting

2

and its negative effect on Gulfport's financial statements, including that Defendants had materially overstated the value of Gulfport's oil and gas assets, and massively understated Gulfport's ceiling test impairment.

7.     Defendants were motivated to cover up the massive ceiling test impairment and internal control deficiencies to protect themselves from the significant external pressure from Firefly and Shah Capital who threatened that if they and Gulfport management failed to deliver immediate improvements to Gulfport's financial results, they could face a proxy contest for control of the Company and lose their positions.  The threat to each of the Defendants was personal, specific and concrete and their careers at Gulfport were on the line.  In sum, Defendants had unique and personal motive to conceal Gulfport's internal control deficiencies and materially false financial statements to protect themselves and their positions and avoid further scrutiny from activist shareholders, and to conceal Gulfport's true financial condition.

8.     At the end of the Class Period, Gulfport disclosed that it received an adverse opinion from its external auditor Grant Thornton LLP ("Grant Thornton"), forcing Gulfport to disclose that its internal control over financial reporting suffered from a material weakness throughout 2019.  Defendants' system for internal control over financial reporting—which Defendants represented they designed, reviewed and represented was effective—was not, in fact, effective.  Defendants admitted that Gulfport did not have effective internal control in place over the completeness and accuracy of the carrying value of Gulfport's oil and gas assets used in Defendants' quarterly ceiling tests.  As a result, the carrying value of Gulfport's oil and gas assets was further impaired by over $500 million during the quarter ended September 30, 2019.

9.     Defendants' intentional, or at least reckless, conduct had a devastating effect on Gulfport's financial statements, including a massive restatement of the Company's financial

3

results for the quarter ended September 30, 2019.  Further, Defendants admitted that, in light of the material weakness in internal control over financial reporting during the Class Period, Defendants' representations concerning Gulfport's disclosure controls and risk warnings were false and misleading at the time they were made.

10.     After these disclosures, Gulfport's common stock price declined approximately 27% on massive trading volume, declining from a closing price on February 27, 2020 of $0.90 per share, to close at $0.65 per share on March 2, 2020 on heavier than usual trading volume. Gulfport's stock has never recovered and the Company declared bankruptcy in November 2020.

## II.     NATURE OF THE ACTION

11.     This is a federal securities class action on behalf of a class consisting of all persons, other than Defendants, who purchased or otherwise acquired Gulfport securities between May 3, 2019 and February 27, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (the "Action").

12.     Defendants are David M. Wood ("Wood"), formerly Gulfport's CEO, President and a member of the Company's board of directors, Keri Crowell ("Crowell"), Gulfport's CFO from before the start of the Class Period until August 9, 2019, when Crowell resigned from her position with the Company, and Quentin R. Hicks ("Hicks"), who served as Gulfport's CFO during the period August 2019 through May 2021.  Defendants Wood, Crowell and Hicks are referred to herein as the "Defendants".

13.     On November 13, 2020, Gulfport announced that it had voluntarily initiated Chapter 11 bankruptcy proceedings and it is not named as a defendant in the Action, as litigation against it has been stayed.  *See* ECF No. 42 ("This is matter is hereby stayed as to Gulfport in light

4

of its bankruptcy petition. *See* 11 U.S.C. § 362(a).").

14.    During the Class Period, Gulfport engaged in the exploration, development, acquisition, and production of natural gas, crude oil, and natural gas liquids ("NGL") in the U.S., with a focus on development of properties located in Eastern Ohio, where it targets development in the Utica formation (the "Utica"), and Central Oklahoma where it targets development in the SCOOP Woodford and Springer formations (the "SCOOP").  During the Class Period, Gulfport's oil and gas production comprised of approximately 97-98% natural gas and NGL, and approximately 2-3% oil.

15.    As a publicly traded Company, the SEC requires Gulfport to establish and maintain a system of adequate internal control over financial reporting.  A company's internal control over financial reporting is a process that, when designed properly, provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for disclosure to the SEC and investors in accordance with generally accepted accounting principles in the U.S. ("GAAP"). Gulfport's management, including Defendants, were responsible for the fair presentation of Gulfport's consolidated financial statements.

16.    Of key importance to oil and gas companies, like Gulfport, is effective design and controls over the completeness and accuracy of the accounting for the cost for exploration and development operations, its most significant assets.

17.    During the Class Period, Gulfport used the full cost method of accounting for its oil and natural gas operations, as defined by the SEC. Under the full cost method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment that are reported in Gulfport's financial statements as an asset. This includes any internal costs that are directly related to property acquisition, exploration

5

and development activities, but does not include any costs related to production, general corporate overhead or similar activities.  These costs form the basis of Gulfport's depreciation, depletion, and amortization ("DD&A") cost pool, which the Company gradually recognizes as an expense as the units of oil and gas are produced.

18.     However, Gulfport's unevaluated oil and gas properties and properties under development include costs that are not being depleted or amortized. These costs represent investments in unproved properties.  Accordingly, while unevaluated properties are capitalized, they are not included in the DD&A cost pool.  Capitalized costs for unevaluated properties are excluded from costs that are being depleted or amortized until proved reserves are found or until major development projects are placed in service, at which time the costs are transferred into the DD&A cost pool.

19.     Defendants complete and accurate accounting of costs that should be capitalized and included in the DD&A cost pool, and costs that are properly excluded from the amortization base is important for oil and gas companies like Gulfport.  This is because Gulfport reviews the carrying or book value of its oil and natural gas properties reported in the Company's financial statements as an asset on a quarterly basis. This quarterly impairment review, in which Gulfport management, including Defendants, participated is referred to as a ceiling test.

20.     Under the full cost method of accounting, the Company performs a ceiling test that determines a limit, or ceiling, on the book value of oil and gas properties.  In sum, the ceiling test provides that all capitalized costs of oil and gas assets on the balance sheet cannot exceed the economic value expected to be received from those oil and gas assets.

21.     Defendants quarterly ceiling tests were critical in 2019 because throughout the year commodity prices were volatile and there were significant declines in commodity prices,

especially natural gas and NGL prices.

22.     Under the ceiling test, net capitalized costs are limited to the lower of unamortized cost of oil and gas properties net of deferred income taxes, or the cost center ceiling, which, in essence, is the expected revenue from the oil and gas properties.

23.     If the net book value, reduced by the related net deferred income tax liability, exceeds the ceiling, an impairment or noncash write-down is required, *i.e.* the costs exceeding the ceiling may no longer be capitalized.

24.     In order for Gulfport to accurately determine whether it had an asset impairment under the ceiling test and to comply with GAAP, Defendants needed to design and maintain controls over the completeness and accuracy of the accounting of transfers of unevaluated capitalized costs to the amortization base when these properties are drilled, abandoned or the lease expires, as well as include these costs in the ceiling test.

25.     Unknown to investors, Defendants knowingly, or at least recklessly, made materially false and misleading statements and failed to disclose that, in contradiction to their representations to investors, Defendants did not effectively design and maintain controls over the completeness and accuracy of the accounting of transfers of unevaluated capitalized costs into the amortization base for the three and nine month periods ended September 30, 2019 and the twelve month period ended December 31, 2019.  As a result, Gulfport's financial statements contained multiple material misstatements, and the Company's financial statements were not prepared in compliance with GAAP.

26.     On February 27, 2020, after the close of trading, investors began to learn the truth about Gulfport's false financial reporting and weaknesses in internal control over financial reporting when Gulfport issued a press release reporting the Company's financial results for the

quarter and year-ended December 31, 2019.

27.     Gulfport reported a net loss of over $2 billion, or a loss of $12.49 per share, reflecting a non-cash impairment charge of $2.039 billion, and further disclosed a material weakness in Gulfport's internal controls over financial reporting that caused an error requiring the Company to restate its financial results for the quarter ended September 30, 2019, and amend its quarterly report for the quarter ended September 30, 2019, which had been filed with the SEC on Form 10-Q on November 1, 2019 (the "Q3 2019 10-Q").

28.     Also on February 27, 2020, after the market closed, Gulfport filed a report with the SEC on Form 8-K ("2/27/20 8-K") that provided further details about the accounting restatement and disclosed that its previously issued financial statements for the three and nine months ended September 30, 2019, "should no longer be relied upon due to material misstatements".  In addition to restating Gulfport's financial statements, the Q3 2019 10-Q revised Gulfport's: 1) Management's Discussion and Analysis of Financial Conditions and Results of Operations; 2) Defendants' evaluation of disclosure controls and procedures; 3) Risk Factors; and 4) SOX Certifications.

29.     Furthermore, the 2/27/20 8-K explained as follows:

In the course of preparing the consolidated financial statements for the year ended December 31, 2019, the Company identified a misstatement of its depreciation, depletion and amortization and impairment of oil and gas properties as of September 30, 2019 of approximately $554 million ($436 million net of the tax benefit) related to unrecorded transfers of its unevaluated oil and natural gas properties into the amortization base. This error impacted the related calculations of the Company['s] depreciation, depletion and amortization and impairment of oil and natural gas properties for the three and nine month periods ended September 2019. Net (loss) income and income tax (benefit) expense have also been impacted.

Management determined it did not effectively design and maintain controls over the completeness and accuracy of the accounting of transfers of unevaluated capitalized costs into the amortization base for the three and nine month periods ended September 30, 2019 and the twelve month period ended December 31, 2019.

Specifically, the Company did not have an adequate process for monitoring that its accounting policies for transferring unevaluated oil and gas properties were consistently being performed timely and reconciled with the general ledger. This material weakness resulted in a material error in the amount of impairment expense booked in relation to our oil and gas properties for the nine months ended September 30, 2019.

In addition, the Company has reassessed its conclusions regarding its disclosure controls and procedures as of September 30, 2019 in light of the misstatements described above. As a result, the Company has determined that a material weakness in internal control over financial reporting existed as of September 30, 2019, and therefore the Company has concluded that its disclosure controls and procedures as of September 30, 2019 were not effective. Therefore, the Company's previous evaluation of its disclosure controls and procedures as of September 30, 2019 should no longer be relied upon.

30.     Also on February 27, 2020, after the close of trading, Gulfport filed an amended quarterly report for the quarter ended September 30, 2019 with the SEC on Form 10-Q/A in which the magnitude of the restatement was set forth ("Q3 2019 Amended 10-Q").  For the three months ended September 30, 2019, Gulfport understated its net loss by approximately 90%, understated impairment of oil and natural gas properties by approximately 94%, and understated depreciation, depletion and amortization by approximately 11%.  Furthermore, for the nine months ended September 30, 2019, instead of net income, Gulfport had a net loss of $187.6 million, understated impairment of oil and natural gas properties by approximately 94%, and understated depreciation, depletion and amortization by approximately 4.4%.  Furthermore, Defendants reported carrying value of Gulfport's oil and gas properties and equipment reported was overstated by over 10%.

31.     Also on February 27, 2020, Defendants caused Gulfport to file its annual report for the year ended December 31, 2019 with the SEC on Form 10-K ("2019 10-K"), which was signed by Defendants Wood and Hicks, in which they admitted that the Company did not maintain effective internal control over financial reporting as of December 31, 2019, and further that Gulfport's disclosure controls and procedures were not effective as of December 31, 2019 because

of the material weakness in internal control over financial reporting. The 2019 10-K included an adverse opinion of Gulfport's auditor Grant Thornton concerning its audit of Gulfport's internal control over financial reporting for 2019.

32.     On February 28, 2020, Gulfport's stock price fell from a closing price on February 27, 2020 of $0.90 per share, to an intraday low of $0.50 per share—a decline of over 44% per share—to close at $0.82 per share, a one-day decline of $0.08 per share, or 8.89%, on heavier than usual volume.  The next trading day, Gulfport shares declined an additional $0.17 per share, or approximately 21%, to close at $0.65 per share on March 2, 2020, on heavier than usual volume. In total, over the course of two trading days, Gulfport shares declined by $0.25 per share, or approximately 27%, on volume of over 35 million shares.

33.     On February 27, 2020, after the close of trading, *MarketWatch* published an article titled "Gulfport Energy restates some Q3 results" that stated, in part, the following:

> Gulfport Energy Corp. on Thursday filed an amended 10-Q report with the U.S. Securities and Exchange Commission, and said it was restating its consolidated financial statements for the three months and for the nine months ended Sept. 30, 2019.
>
> Gulfport said a routine year-end financial review by its new management team "identified an error related to the transfer of certain unevaluated leasehold costs to the amortization base. Based upon the evaluation of the error, Gulfport concluded that the error resulted from a material weakness in our internal controls over financial reporting."
>
> The company also said, "our management is currently evaluating our policies and procedures related to its process of accounting for unproved oil and gas properties. We plan to design and implement additional controls to ensure that we are properly and timely identifying and transferring leasehold costs associated acreage expirations, lease transfers, and proved reserve additions from the unevaluated capitalized cost pool to the evaluated amortization base."
>
> As a result of its restatement, Gulfport said, it was reporting a third-quarter net loss of $484.8 million, greater than the originally reported net loss of $48.7 million. On a per share basis, the company reported a net loss of $3.04, higher than the originally reported loss of 31 cents.

34.     On February 28, 2020, the *Oklahoma City News* published an article titled "Gulfport Energy writes down value of oil, gas assets in 2019, report shows" that stated, in part, the following:

> An expensive write-down contributed to big losses on the year for Gulfport Energy. After markets closed Thursday, the company issued a report stating it lost about $2.02 billion, or $12.49 per share, on total revenues of about $1.35 billion for the entire year. Gulfport wrote down the value of its oil and natural gas assets by $2 billion in 2019.  As part of that, the company took an impairment charge on the value of its oil and gas assets of about $2.04 billion.

35.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## III.    JURISDICTION AND VENUE

36.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

37.     This Court has jurisdiction over the subject matter of the Action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

38.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  During the Class Period, Gulfport's securities traded on the Nasdaq Global Select Market ("NASDAQ"), located within this Judicial District.

39.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    PARTIES

40.    Plaintiff, as set forth in the Certification previously filed with the Court (ECF No. 8-2), acquired Gulfport securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

41.    Defendant Wood served as Gulfport's CEO and President and as a member of its board of directors and Gulfport's management team during the period December 2018 through May 2021.  During the Class Period, Defendant Wood caused Gulfport to file: 1) Gulfport's Quarterly Report on Form 10-Q with the SEC on May 3, 2019, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "1Q 2019 10-Q"); 2) Gulfport's Quarterly Report on Form 10-Q with the SEC on August 2, 2019, reporting the Company's financial and operating results for the quarter ended June 30, 2019 (the "2Q 2019 10-Q"); and 3) the Q3 2019 10-Q.  Further, Defendants Wood signed certifications pursuant to SOX that were attached exhibits to the 1Q 2019 10-Q, 2Q 2019 10-Q, and Q3 2019 10-Q.  Defendant Wood "retired" from Gulfport in May 2021.

42.    Defendant Crowell served as Gulfport's CFO and as a member of Gulfport's management team from before the start of the Class Period until August 9, 2019, when Crowell resigned from her position with the Company.  Defendant Crowell had served as CFO of the Company since January 2017 and as Secretary since October 2017. Prior to these roles, Defendant Crowell served as Chief Accounting Officer ("CAO") of the Company from September 10, 2015 until her appointment as CFO in January 2017.  Defendant Crowell also served as a Vice President of the Company from April 2014 until her appointment as CFO in January 2017 and as Controller from March 2006 until her appointment as CAO in September 2015. Defendant Crowell joined the Company in October 2005 as Assistant Controller.  Defendant Crowell signed Gulfport's 1Q 2019 10-Q and 2Q 2019 10-Q, and signed SOX certifications that were attached exhibits to the 1Q

2019 10-Q and 2Q 2019 10-Q.

43.     Defendant Hicks served as Gulfport's CFO and a member of Gulfport's management team during the period August 2019 through May 2021.  On August 9, 2019, Gulfport appointed Hicks as the Company's Executive Vice President and CFO, effective August 26, 2019. Defendant Hicks signed Gulfport's 3Q 2019 10-Q and signed a SOX certifications that was an attached exhibit to the 3Q 2019 10-Q.  Defendant Hicks "resigned" from Gulfport in May 2021.

44.     Defendants possessed the power and authority to control the contents of Gulfport's SEC filings,  press releases, and other market communications. Defendants were provided with copies of Gulfport's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Gulfport, and their access to material information available to them but not to the public, Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  As the most senior executives of the Company, Defendants had access to Gulfport's general ledger, which recorded the carrying value of Gulfport's oil and gas properties, and each of them had access to the data inputs used in Defendants' ceiling tests during the Class Period and participated in quarterly ceiling tests.  The information concerning the carrying value of Gulfport's oil and gas properties in Gulfport's general ledger to which Defendants had access contradicted both the inputs used in the ceiling test and representations made to investors.  Defendants are liable for the false statements and omissions pleaded herein.

V.     RELEVANT NONPARTY

45.     Gulfport is a Delaware corporation with principal executive offices located at 3001 Quail Springs Parkway, Oklahoma City, Oklahoma. During the Class Period, Gulfport's securities

traded on the NASDAQ under the ticker symbol "GPOR."

46.     On November 13, 2020, Gulfport and its wholly-owned subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101—1532 in the United States Bankruptcy Court for the Southern District of Texas and the chapter 11 cases are being jointly administered under the lead case *In re Gulfport Energy Corporation*, Case No. 20-35562 (DRJ) (S.D. Tex.).  Under section 362(a) of the Bankruptcy Code, Gulfport's filing of its voluntary petition gave rise to a stay of claims alleged against it in the Action.

47.     But for Gulfport's bankruptcy, it would have been named as a defendant in the Action for its wrongful conduct alleged herein in violation of Section 10(b) and rule 10b-5.

48.     Gulfport's bankruptcy resulted in the cancellation of over 160 million shares of Gulfport common stock and total loss of equity for Gulfport shareholders, including shareholders who are members of the Class.  Gulfport shareholders did not receive a distribution on account of their equity interest under Gulfport's bankruptcy plan of reorganization.

## VI.   SUBSTANTIVE ALLEGATIONS

### A.  Background

49.     Gulfport was formed in 1997 and purports to be an independent natural gas-weighted exploration and production company focused on the exploration, development, acquisition and production of natural gas, crude oil and NGL in the U.S. with primary focus in the Appalachia and Mid-Continent basins. Gulfport's principal properties are located in the Utica and SCOOP.

### B.  The SEC Required Defendants to Design Policies and Procedures for Effective Internal Control over Financial Reporting

50.     A company's internal control over financial reporting is a process that, when

14

designed properly, provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

51.     During the Class Period, Gulfport's management, including Defendants, were responsible for the fair presentation of Gulfport's consolidated financial statements.

52.     Gulfport's management, including Defendants, were responsible for establishing and maintaining a system of adequate internal control over financial reporting, as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act. These internal controls are designed to provide reasonable assurance that Gulfport's reported financial information is presented fairly, that disclosures are adequate and that the judgments inherent in the preparation of financial statements are reasonable.

53.     Gulfport's internal control over financial reporting includes those policies and procedures that: (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of the Company were being made only in accordance with authorizations of Defendants, Gulfport's management and directors of the Company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on its financial statements.

54.     Gulfport's management, including Defendants, were responsible for maintaining effective internal control over financial reporting and for their assessment of the effectiveness of internal control over financial reporting during the Class Period, and filed SOX certifications attesting to their assessments.

15

55.     A material weakness is a deficiency, or combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

### C.  The SEC Required Defendants to Maintain Effective Disclosure Controls and Procedures

56.     A company's disclosure controls and procedures, when designed effectively, ensure that information required to be disclosed in reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to management, including the CEO and CFO, to allow timely decisions regarding required disclosure.

57.     The SEC required Defendants to carry out an evaluation, under the supervision and with the participation of Gulfport's management, of the effectiveness of the design and operation of Gulfport's disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b), and during the Class Period, and filed SOX certifications attesting to the effectiveness of Gulfport's disclosure controls and procedures.

### D.  Defendants Were Required to Issue Financial Statements in Compliance with GAAP and SEC Accounting Rules and Regulations

58.     During the Class Period, the SEC required Defendants to prepare Gulfport's financial statements in conformity with GAAP and Defendants represented that they did so.

59.     GAAP are uniform minimum standards of, and guidelines to, financial accounting and reporting.

60.     The SEC has the statutory authority for the promulgation of GAAP for public companies.

61.     Under 17 C.F.R. §210.4-01(a)(1), financial statements filed with the SEC that are

not prepared in compliance with GAAP are presumed to be misleading or inaccurate. ("Financial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate.").

62.     During the Class Period, Gulfport used the full cost method of accounting for its oil and natural gas operations.

63.     The full cost method is prescribed by the SEC and is principally set forth in Rule 4-10(c) of Regulation S-X (17 C.F.R. § 210.4-10(c)) and interpreted through the periodic issuance of Staff Accounting Bulletins (SABs) and other communications by the SEC staff.

64.     Under the full cost method, all costs, including nonproductive costs and certain general and administrative costs associated with acquisition, exploration and development of oil and natural gas properties, are capitalized.

65.     A capitalized cost is an expenditure that is added to the cost basis of a fixed asset on a company's balance sheet. Capitalized costs are incurred when purchasing fixed assets. Capitalized costs are not expensed in the period they were incurred, but recognized over a period of time via DD&A.

66.     However, unevaluated oil and gas properties and properties under development include costs that are not being depleted or amortized. These costs represent investments in unproved properties. These costs are excluded from DD&A, until proved reserves are found, until it is determined that the costs are impaired or until major development projects are placed in service, at which time the costs are moved into oil and natural gas properties subject to amortization.

67.     Defendants proper accounting of costs for oil and gas properties that should be capitalized, and those that are excluded from the amortization base is important for oil and gas

companies like Gulfport.  If capitalized costs of oil and gas properties exceed estimated future oil and gas revenue, under GAAP, the costs that exceed estimated oil and gas revenue are impaired and must be written off during the period in which the impairment occurs.

68.     Oil and gas companies like Gulfport are required on a quarterly basis to determine whether reported capitalized cost are recoverable.  Under the full cost accounting method, Gulfport accounted for oil and gas properties costs using the "ceiling test."

69.     In essence, the ceiling test determines a limit, or ceiling, on the book value of the oil and gas properties, *i.e.*, the costs for oil and gas properties that may be capitalized.  Net capitalized costs are limited to the lower of unamortized cost net of deferred income taxes, or the cost center ceiling.  The cost center ceiling is defined as the sum of (a) estimated future net revenues, discounted at 10% per annum, from proved reserves, based on the 12-month unweighted average of the first-day-of-the-month price, adjusted for any contract provisions or financial derivatives, if any, that hedge the Company's oil and natural gas revenue (only to the extent that the derivative instruments are treated as cash flow hedges for accounting purposes), and excluding the estimated abandonment costs for properties with asset retirement obligations recorded on the balance sheet, (b) the cost of unproved properties not being amortized, if any, and (c) the lower of cost or market value of unproved properties included in the cost being amortized, including related deferred taxes for differences between the book and tax basis of the oil and natural gas properties.

70.     For the ceiling test to produce accurate results, Defendants needed to have designed and maintained effective controls and procedures to determine the amount of capitalized costs that should be compared to estimated future revenues.  A deficiency in internal controls that negatively affect the completeness and accuracy of transferring costs for unevaluated oil and gas properties will cause ceiling tests to be inaccurate and violate GAAP.

**E.  Defendants Admit to Making False Financial Statements, to Internal Control Deficiencies, and to Issuing False Financial Statements**

71.     As alleged in Paragraphs 29 and 31, Defendants Wood and Hicks have admitted that, during the Class Period, Gulfport's internal control over financial reporting concerning the completeness and accuracy of the accounting for transfers of unevaluated capitalized costs into the amortization base during 2019 was materially defective and suffered from a material weakness.

72.     Specifically, Gulfport's processes and controls relating to transfer of unproved property costs to the amortization base were not sufficient to identify certain leases that had been drilled, abandoned or expired.

73.     Gulfport's management, which included Defendants Wood and Hicks, further admitted that Gulfport management did not effectively design controls for timely and consistent reviews of accounting entries and supporting documentation related to: 1) transfers of unproved oil and gas property costs into the amortization base, and 2) timely performance and review of reconciliations of land records to the general ledger.

74.     The reconciliation of capitalized costs to the Company's general ledger is a basic financial reporting process. For Defendants to have failed the most basic of requirements for an effective system of internal control over financial reporting in connection with Gulfport's quarterly ceiling tests was, at a minimum, reckless.  Reconciliation in connection with the ceiling test is essentially comparing inputs used in the ceiling test to the capitalized costs recorded in the general ledger, and such comparison did not require or involve Defendants' subjective judgment or complex calculations.

75.     As a result of Gulfport's defective internal controls over financial reporting, for the quarter ended September 30, 2019, Gulfport failed to capitalize over $500 million in costs that were required to be capitalized under GAAP.

76.     As a result of Gulfport's material weakness in internal control over financial reporting, the ceiling test conducted for, at least, the quarter ended September 30, 2019 improperly excluded over $500 million of costs that should have been included as a component of the capitalized costs subject to the ceiling test, in violation of GAAP.  As a result, the Company's carrying value of its oil and natural gas properties under the full cost method of accounting was overstated by $535.8 million, or by over 10% (a $35.6 million impairment of Gulfport's oil and gas was reported in the Q3 2019 10-Q, but was, in fact $571.4 million at that time).

77.     Gulfport's reported financial statements for the quarter ended September 30, 2019 recklessly failed to report a material impairment of Gulfport's capitalized costs of over $500 million in violation of GAAP. The impairment charge that was recorded by the Company in its restated financial statements in the Q3 2019 Amended 10-Q represented in excess of 10% of the Company's net book value of capitalized costs related to oil and gas activities. This represented a material write-down in value of the Company's reported oil and gas properties.

78.     Defendants' failure to comply with GAAP alleged above caused Gulfport's financial statements to materially understate impairment expenses, net loss and DD&A, for at least, the quarter ended September 30, 2019, and materially overstate net income, and materially understate impairment expenses and DD&A for the nine months ended September 30, 2019.

79.     Defendants have further admitted that Gulfport failed to maintain effective internal controls during 2019, not just as of the third and fourth quarters of 2019.  As a result of the material weakness in internal control over financial reporting described above, Gulfport management, which included Defendants Wood and Hicks, concluded that Gulfport did not maintain effective internal control over financial reporting as of December 31, 2019.

80.     Defendants were also required to comply with Section 13(b)(2)-(7) of the Exchange

Act, which required them to cause Gulfport to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of assets. Defendants were required to cause Gulfport to devise and maintain internal accounting controls that were sufficient to provide reasonable assurance that, among other things, transactions were recorded as necessary to permit the preparation of financial statements in conformity with GAAP and to maintain accountability of assets.

81.     Defendants have admitted that for the year ended December 31, 2019 Gulfport had a material weakness in internal control over financial reporting, which in effect, is an admission that they failed to comply with Section 13(b)(2)-(7).

82.     Further, Defendants have admitted that Gulfport did not maintain effective disclosure controls and procedures as of September 30 and December 31, 2019 because of the material weakness in Gulfport's internal control over financial reporting alleged above.

83.     As a result of the foregoing, Defendants Wood and Hicks and Gulfport management determined to amend the Q3 2019 10-Q to:

    a.   restate the unaudited consolidated financial statements as of and for the three and nine months ended September 30, 2019 reported in the Q3 2019 10-Q;

    b.   revise Management's Discussion and Analysis of Financial Conditions and Results of Operations reported in the Q3 2019 10-Q;

    c.   revise Defendants Wood and Hicks' evaluation of disclosure controls and procedures reported in the Q3 2019 10-Q;

    d.   revise Gulfport's risk factors reported in the Q3 2019 10-Q; and

    e.   revise Defendants Wood and Hicks' SOX Certifications that were filed with the Q3 2019 10-Q.

84.     In addition, Defendants admitted that Gulfport had a material weakness in internal control over financial reporting during 2019, and that Gulfport's disclosure controls and procedures were ineffective during 2019.

85.     ***Restatement of Q3 2019 Consolidated Financial Statements***. The Q3 2019 Amended 10-Q quantified the restatement of Gulfport's financial statements for the three and nine months ended September 30, 2019.  For the three months ended September 30, 2019:

- Gulfport's net loss was $484.8 million, or $3.04 per share, an understatement of reported net loss by $436 million or $2.73 per share—or by approximately 90%,

- Gulfport's impairment of oil and natural gas properties was $571.4 million, an understatement of reported impairment of oil and natural gas properties charge of $535.8 million—or by approximately 94%; and

- Gulfport's DD&A was $163.2 million, an understatement of reported DD&A by $17.7 million—or by approximately 11%.

86.     Furthermore, for the nine months ended September 30, 2019:

- instead of net income, Gulfport had a net loss of $187.6 million or $1.17 per share;

- Gulfport's reported impairment of oil and natural gas properties was understated by approximately 94%; and

- Gulfport's DD&A was $406.7 million, an understatement of reported DD&A of $17.8 million or by approximately 4.4%.

87.     ***Revisions to Q3 2019's Management's Discussion and Analysis of Financial Conditions and Results of Operations***.  Item 303 of SEC Regulation S-K, 17 C.F.R. 929.303 ("Item 303") required Defendants to disclose in Management's Discussion and Analysis ("MD&A") section of the 3Q 2019 10-Q: (i) unusual events, transactions or significant economic

changes that materially affected the amount of Gulfport's reported income from continuing operations and the extent of such changes; and (ii) known trends or uncertainties reasonably expected to have a material impact on the Company's net sales or revenues or income from continuing operations.

88.     As a result of the restatement of Gulfport's financial statements delineated above in Paragraphs 30, 85-86, Gulfport's comparison of the three and nine month periods ended September 30, 2019 compared to three and nine month periods ended September 30, 2018 were materially false and misleading and violated Item 303.

89.     Gulfport's Q3 2019 10-Q failed to disclose in the MD&A section that, during the three and nine months ended September 30, 2019, Gulfport had a $571.4 million oil and natural gas properties impairment charge, compared to no impairment charge of oil and gas properties during the same periods in 2018.  The MD&A section also included the false financial results for the three and nine months ended September 30, 2019.

90.     Defendants failure to disclose this material information violated Item 303 because it was (i) an unusual event, transaction or significant economic changes that materially affected the amount of Gulfport's reported income from continuing operations and the extent of such changes; and (ii) was a known trend or uncertainty reasonably expected to have, and did in fact have, a material impact on the Company's net income or loss from continuing operations, as evidenced by Gulfport's restated financial results for the quarter and three months ended September 30, 2019.

91.     ***Revisions to Gulfport's Q3 2019 Disclosure Controls and Procedures***.  The Q3 2019 Amended 10-Q explained that Gulfport's disclosure controls and procedures were materially defective:

At the time of our Original Filing on November 1, 2019, an evaluation was performed under the supervision and with the participation of management, including [Defendant Wood] and [Defendant Hicks], of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rule 13a-15(b) under the Exchange Act. Based upon that evaluation, [Defendant Wood] and [Defendant Hicks] concluded that, as of September 30, 2019, our disclosure controls and procedures were effective. Subsequent to the evaluation made in connection with our Original Filing, a material weakness was identified in our internal control over financial reporting. [Defendant Wood] and [Defendant Hicks] have re-evaluated the effectiveness of the design and operation of our disclosure controls and procedures and concluded that, as a result of the material weakness in our internal control over financial reporting discussed below, our disclosure controls and procedures were not effective as of September 30, 2019.

During the fourth quarter of fiscal year 2019, management identified a material weakness in our controls related to the completeness and accuracy of the accounting for transfers of unevaluated capitalized costs into the amortization base for the three and nine month periods ended September 30, 2019. The following deficiencies primarily contributed to management's assessment:

- The processes and controls relating to transfer of unproved property costs were not sufficient to identify certain leases that had been drilled, abandoned or expired.

- Management determined it did not effectively design controls for timely and consistent reviews of accounting entries and supporting documentation related to transfers of unproved oil and gas property costs into the amortization base and related to timely performance and review of reconciliations of land records to the general ledger.

This material weakness resulted in a material error in the amount of impairment expense recorded in relation to our oil and gas properties for the nine months ended September 30, 2019 and resulted in the Company restating its consolidated financial statements as of and for the three and nine months ended September 30, 2019.

92.     ***Revisions to Gulfport's Q3 2019's Risk Factors***.  Under 17 C.F.R. § 229.105

(Item 105) Risk factors, the SEC required Defendants to disclose "the material factors that make

an investment in the registrant or offering speculative or risky" and to "[c]oncisely explain how

each risk affects the registrant or the securities being offered."

93.     The Q3 2019 Amended 10-Q added the following new risk factor concerning a

material weakness in Gulfport's internal controls, and in effect, admitted that Gulfport's Q3 2019

10-Q failed to disclose a material risk concerning a material weakness in internal controls that had

already materialized and was adversely affecting Gulfport at the time Defendant Wood and Hicks

filed the Q3 2019 10-Q with the SEC:

> ***We have identified a material weakness in internal controls. If we fail to remediate
> this material weakness or otherwise fail to develop, implement and maintain
> effective internal controls in future periods, our ability to report our financial
> condition and results of operations accurately and on a timely basis could be
> adversely affected.***

94.     ***Revised Q3 2019 SOX Certifications***.  The Q3 2019 amended 10-Q revised, and

in effect withdrew, the SOX certifications signed by Defendants Wood and Hicks dated November

1, 2019 that were filed with the Q3 2019 10-Q.

95.     ***Gulfport's Material Weakness in Internal Control over Financial Reporting***

***during 2019.***  Also on February 27, 2020, Defendants caused Gulfport to file the 2019 10-K, that

stated the following:

> Management determined it did not effectively design and maintain controls over
> the completeness and accuracy of the accounting of transfers
> of unevaluated capitalized costs into the amortization base for the three and nine
> month periods ended September 30, 2019 and the twelve month period ended
> December 31, 2019. Specifically, we did not have an adequate process for
> monitoring that our accounting policies for transferring unevaluated oil and gas
> properties were consistently being performed timely and reconciled with the
> general ledger. This material weakness resulted in a material error in the amount of
> impairment expense booked in relation to our oil and gas properties for the nine
> months ended September 30, 2019 and resulted in the Company restating its
> consolidated financial statements as of and for the three and nine months ended
> September 30, 2019.
>
> As a result of the material weakness in internal control over financial reporting
> described above, management has concluded that we did not maintain effective
> internal control over financial reporting as of December 31, 2019.

96.     The 2019 10-K included Grant Thornton's report concerning its audit of

Gulfport's internal control over financial reporting, which stated, in part, the following:

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in the 2013 *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), and our report dated February 27, 2020 expressed an adverse opinion.

\*\*\*

**Opinion on internal control over financial reporting**

We have audited the internal control over financial reporting of Gulfport Energy Corporation (a Delaware corporation) and subsidiaries (the "Company") as of December 31, 2019, based on criteria established in the 2013 *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). In our opinion, because of the effect of the material weakness described in the following paragraphs on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2019, based on criteria established in the 2013 *Internal Control-Integrated Framework* issued by COSO. . . .

The following material weakness has been identified and included in management's assessment:

The Company did not have effective internal control in place over the completeness and accuracy of the information used in determining the accounting for transfers of unevaluated capitalized costs into the amortization base. . . .

97.     ***Defendants Admission that Disclosure Controls and Procedures were Ineffective during 2019.*** Furthermore, the 2019 10-K stated, in part, that:

As of the end of the period covered by this report [December 31, 2019], we carried out an evaluation, under the supervision and with the participation of management, including [Defendant Wood] and [Defendant Hicks], of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b). Based on that evaluation, [Defendant Wood] and [Defendant Hicks] concluded that our disclosure controls and procedures were not effective as of December 31, 2019 because of the material weakness in our internal control over financial reporting described in Management's Report on Internal Control Over Financial Reporting disclosed below.

[Defendant Wood] and [Defendant Hicks] also determined that the material weakness existed at September 30, 2019 and also concluded that we did not maintain effective disclosure controls and procedures as of that date. [Defendant Wood] and [Defendant Hicks] have concluded that the unaudited condensed consolidated financial statements included in the Form 10-Q filing for the reporting period ended September 30, 2019 were materially misstated as a result of the

material weakness. The Company filed an amended Form 10-QA for the period ended September 30, 2019 with the restated amounts. . . .

Management determined it did not effectively design and maintain controls over the completeness and accuracy of the accounting of transfers of unevaluated capitalized costs into the amortization base for the three and nine month periods ended September 30, 2019 and the twelve month period ended December 31, 2019. Specifically, we did not have an adequate process for monitoring that our accounting policies for transferring unevaluated oil and gas properties were consistently being performed timely and reconciled with the general ledger. This material weakness resulted in a material error in the amount of impairment expense booked in relation to our oil and gas properties for the nine months ended September 30, 2019 and resulted in the Company restating its consolidated financial statements as of and for the three and nine months ended September 30, 2019.

As a result of the material weakness in internal control over financial reporting described above, management has concluded that we did not maintain effective internal control over financial reporting as of December 31, 2019.

**F.  Defendants Had Motive and Opportunity to Commit Fraud**

98.     Starting in or around January 2019 and during the Class Period, an activist shareholder of Gulfport, Firefly, which owned over 8% of Gulfport's common stock, publicly expressed concern about Gulfport's board and management, its stock price underperformance and unwillingness to commit to actions to maximize value for Gulfport shareholders.  Similarly, Shah Capital, a Gulfport shareholder which owned approximately 3 million shares, similarly challenged Gulfport's board and management during the Class Period.

99.     In light of the pressure exerted by shareholders Firefly and Shah Capital on Gulfport's board and management to improve Gulfport's stock performance during the Class Period and capitalize on its assets and threatened proxy contest, Defendants were motivated to conceal Gulfport's material weakness in internal control over financial reporting and its negative effect on Gulfport's financial statements, including that Defendants had overstated the value of Gulfport's oil and gas assets in order to maintain the artificial inflation in Gulfport's stock price.

100.    Defendants were motivated to protect themselves from the significant pressure

from Firefly and Shah Capital who threatened that if they and Gulfport management failed to deliver immediate improvements to Gulfport's financial results, they could face a proxy contest for control of the Company and lose their positions.

101.    The threat to each of the Defendants was personal and concrete and their careers at Gulfport were on the line.  Indeed, there was significant external pressure and threats from Firefly and Shah Capital directed specifically at Gulfport's board of directors and its management, which included Defendants.

102.    On January 17, 2019, Firefly issued a press release titled "Firefly Value Partners Sends Letter to Gulfport Energy Corporation Board of Directors", which stated the following:

> as we previously communicated to you, we have been discouraged by the Board's lack of urgency in addressing the Company's prolonged stock price underperformance and its unwillingness to commit to actions that we believe would maximize value for stockholders.
>
> At this point, we are concerned that the current Board does not possess the necessary skills, experience, or alignment with the Company's stockholders to effectively steer Gulfport's strategy and maximize long-term shareholder value. . . .
>
> **We Are Concerned that the Board Is Unwilling or Unable to Take Necessary Actions**
>
> Despite Gulfport's long-term underperformance, based on our dialogue with Chairman David Houston, we are concerned that the Board will not commit to actions we believe are necessary to maximize stockholder value.
>
> The current Board does not seem up to the task of fixing the Company's capital allocation strategy and regaining investors' trust. Certain of the Company's directors appear to lack the relevant experience needed to navigate Gulfport's business and the expectations of its investors. Other directors have served for so long that their willingness to drive change at Gulfport may be compromised. *Additionally, Gulfport's directors own just $2.4M of stock combined—roughly 0.16% of the Company.  And almost all of that stock was acquired as compensation for Board service. This paltry level of investment creates a misalignment with the interests of the Company's long-term stockholders.*
>
> Thus far, *our efforts to engage privately with the Board have left us questioning*

28

***whether the Board's composition must change before Gulfport will take actions necessary to maximize stockholder value***. We believe that adding meaningful stockholder representation would greatly enhance the Board's perspective.

(Footnotes omitted and emphasis added).

103.    On March 6, 2019, Firefly issued a press release titled "Firefly Value Partners Sends Letter to Gulfport Energy Corporation Board of Directors" that stated:

> . . . Gulfport still has a lot of work to do to regain investor trust and set the Company on a path to maximizing value for stockholders. As we outlined in our January 17th letter to the Board, Gulfport has made several capital allocation missteps, including issuing large amounts of equity five times since 2013—each time at successively lower prices. Long-term investors have endured the massive underperformance of Gulfport's shares—relative to both Gulfport's peer group and the broader market— over the last one, three, and five-year periods. ***This is particularly frustrating given the Board's low combined stock ownership: less than 0.2% of the Company***. . .
>
> We believe that in order to address the concerns of long-term stockholders, Gulfport and its Board must take the following actions in 2019:
> 1.  Implement the capital and operational plan announced on January 17th, 2019, including executing the $400M share buyback plan with urgency.
> 2.  ***Set short-term and long-term executive compensation incentives that are more closely aligned with the best interests of all stockholders.***
> 3.  Abstain from equity issuances.
>
> . . . we will continue to advocate for long-term stockholders' interests. ***If the Company does not accomplish the three goals articulated above, we believe the Board's composition will need to change.***

(Emphasis added).

104.    Under intense pressure from activist shareholders who asserted that Defendants' interests were not aligned with the best interests of Gulfport shareholders, on August 30, 2019, Defendants' Wood and Hicks acquired a de minimis amount of Gulfport shares (respectively 1.5% and 8% of their 2019 compensation) in an effort to deflect the criticism that Gulfport insiders owned a paltry level of investment in Gulfport stock and that their interests were not aligned with Gulfport's shareholders' best interests.

105.    Defendants Wood and Hicks cosmetic efforts to quell shareholder pressure were

unsuccessful and the pressure campaign continued to threaten their positions and careers.

106.    On September 6, 2019, Shah Capital issued a press release titled "Shah Capital

Asks Gulfport to Reduce 2020 Capex by Over 25%" that stated the following:

> . . . our disappointment is rooted in our belief that management and board have not yet utilized some of the tools available to stop this massive equity underperformance, and begin to propel Gulfport towards a more virtuous cycle.
>
> We strongly encourage a greater sense of urgency in the implementation of our above recommendations. Frankly, we challenge the new management team to lead Gulfport in a way that sets an example for the entire E&P industry in terms of further capital discipline and production cutbacks where majority of industry peers including private operators have failed miserably. Though capital efficiency is very important, the E&P industry must also act rational in reducing future dry/wetgas production meaningfully to earn respectable return on invested capital and equity. ***The cash generating strength of Gulfport's Utica assets combined with NGL rich and cost friendly SCOOP acreage, not to mention significant ability to unlock value from quality non-core assets*** gives us confidence that Gulfport's underlying strengths have been buried and forgotten by years of past missteps, misappropriations, and lack of agility. Gulfport's new management team has an extremely unique opportunity to lead to relevance and establish themselves as a role model. In doing so, you will earn the respect of the investment community.

(Emphasis added).

107.    Unable to thwart the pressure and threats from activist shareholders, on November

18, 2019, just weeks before the end of the Class Period, Defendants attempted to address the

activist shareholders' demands, while protecting their positions at Gulfport.  Gulfport filed a report

on From 8-K with the SEC that stated that two of its Board members, Craig Groeschel and Scott

E. Streller, would step down from the Gulfport board of directors by year-end, and that the

Chairman of Gulfport's board of directors, David L. Houston, decided not to seek re-election at

the Company's 2020 annual meeting.  Gulfport further disclosed a 13% reduction in employee

headcount.

108.    Days later, on November 20, 2019, Gulfport filed a report with the SEC on Form

8-K that stated the Company accepted the retirement notice of Stuart Maier ("Maier"), Senior Vice

President of Geosciences, from his position with the Company, effective as of December 20, 2019.

Maier was a key senior Gulfport executive involved in the Company's expanded development and

production of the SCOOP and related expansion of Gulfport's capital budget in 2017—both of

which Shah Capital and Firefly criticized (¶¶ 103, 106).

109.    On November 21, 2019, Firefly issued a press release that stated the following:

Firefly Value Partners Sends Letter to Gulfport Energy Corporation Board of Directors

Disappointed that Company has Rebuffed Firefly's Attempts at Constructive Private Engagement and Collaboration around Board Refreshment

Believes that Incumbent Board—Which has Overseen Massive Value Destruction and a Strong of Poor Decisions—Should Not be Trusted to Select New Directors Who Possess Sufficient Independence and Experience

Board Refresh Needs to Include Firefly Principal as Shareholder Representative

We have had a meaningful investment in Gulfport since 2013. Over the past six years, two things have remained constant: Gulfport has had a *first-rate asset in the Utica Shale, and Gulfport's Board of Directors (the "Board") has seemingly done its best to prevent the full value of this asset from accruing to shareholders.*

In late 2018, after years of underperformance in the Company's shares, Firefly initiated a private dialogue with the Board.  Throughout that dialogue, we expressed our concerns about the Board's history of poor governance and its approval of value destructive capital allocation policies. To address these issues and promote alignment between stockholders and Company directors, we proposed an action plan, including the addition of meaningful shareholder representation in the boardroom. *The Board refused, instead promising that the Company's latest personnel changes would lead to improvements in governance and strategy*.

Disappointed by the Board's unwillingness to work constructively with shareholders, Firefly published a public letter on January 17th outlining proposals to improve the Company's capital allocation. Later that day, the Board announced a capital plan that substantially adopted our suggestions. . .

*Almost a year has passed since Firefly first engaged with the Board. Unfortunately, things have not improved.* The Company has not even come close to fulfilling its commitments to urgently pursue non-core asset sales and return cash proceeds to shareholders. While the Company has issued presentations and press releases regarding its plans, these steps have been half measures at best and do not

31

show real progress or strategic direction from the Board.

The market has reacted negatively to this state of affairs, sending Gulfport's shares down another 66% since our first public letter. Over six years, Gulfport's shares have lost an incredible 95% of their value. Gulfport's performance lags those of its peers and the overall market by a massive margin.

***We strongly believe that a Board refresh is needed. In fact, we have expressed this view repeatedly to the Company, both in public and private discussions***. In our most recent discussions, we specifically identified the need for three directors to be replaced and for a shareholder representative to be added to the Board. We proposed that the Company collaborate with us to identify three candidates who possess the right mix of skillsets and experience—and add a Firefly principal to the Board to ensure that the best interests of all shareholders are represented.

***However, in the middle of our most recent private discussions, instead of engaging with us in good faith to add true shareholder representation and necessary skills to the Board, the Company rushed out a press release with vague commitments to Board refreshment.*** On November 18th, the Company announced the planned resignations of nearly half of the Board without naming their replacements or providing a timeline to do so. ***We view this half-baked proposal as yet another example of poor strategic planning and a deafness to the urgency of shareholder concerns. This defensive response does nothing to satisfy the need for shareholder perspective in the boardroom.*** Unsurprisingly, the market reacted poorly, sending the shares down another 12%.

***We believe the Board's actions send a crystal-clear message that the Board does not care about having shareholders' perspectives in the boardroom or their input when it comes to finding highly qualified directors. Instead, the Board has chosen to act unilaterally while ignoring the attempted engagement of the Company's largest active shareholder.***

We are reluctant to resort to public and potentially antagonistic actions, but we must advocate for Gulfport's shareholders.  Unfortunately, the only time we see positive change at this Company is when shareholders stand up against the very Board that is charged with representing them. ***The incumbent Board has overseen numerous failures and massive underperformance. The directors responsible for this should not be trusted to select the right people to clean up the mess they have made.***

That is why we are asking that the Board immediately fill one of the new director vacancies with a Firefly principal as a shareholder representative.  This representative would work collaboratively with the remaining Board members to select the best candidates to fill the upcoming vacancies and complete the belated Board refresh, then help establish improved capital allocation and governance oversight at the Company. We find it astounding that a Board with Gulfport's track record of value destruction continues to deny the need for large shareholder

32

representation.

. . . If our calls for collaborative engagement are once again ignored, *we will be compelled to take action. Change is needed, and we will pursue any and all options available to us, including the nomination of director candidates for election to the Board at the 2020 Annual Meeting.*

(Emphasis added and footnotes omitted).

110.    In light of the pressure exerted by shareholders Firefly and Shah Capital on Gulfport's board and management, including Defendants, to improve Gulfport's stock performance during the Class Period and capitalize on its assets and threatened proxy contest, Defendants were motivated to conceal Gulfport's material weakness in internal control over financial reporting and its negative effect on Gulfport's financial statements throughout the Class Period, including that Defendants had materially overstated the value of Gulfport's oil and gas assets in order to maintain the artificial inflation in Gulfport's stock price.

111.    Defendants were motivated to protect themselves from the significant external pressure from Firefly and Shah Capital who threatened that if they and Gulfport management failed to deliver immediate improvements to Gulfport's financial results, they could face a proxy contest for control of the Company and lose their positions.

112.    Thus, throughout the Class Period, Defendants' careers and the survival of the Company were on the line.  Indeed, that Defendant Crowell and certain Gulfport directors and officers were forced out of the Company during the Class Period confirms that these motivating fears were realistic, concrete and personal to Defendants.

## VII.    DEFENDANTS CAUSED GULFPORT TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

113.    During the Class Period, Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and Defendants knew, or disregarded

33

with at least recklessness, that their representations were false and misleading at the time they made their representations.

### A.    Defendants Wood and Crowell Made Materially False and Misleading Statements, and Omitted to Disclose Material Facts That They Had a Duty to Disclose in Gulfport's Q1 2019 10-Q

114.    On May 3, 2019, Defendants Wood and Crowell caused Gulfport to file the 1Q 2019 10-Q that was signed by Defendant Crowell.  The 1Q 2019 10-Q represented the following:

> As of March 31, 2019, an evaluation was performed under the supervision and with the participation of management, including [Defendant Wood] and [Defendant Crowell], of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rule 13a-15(b) under the Exchange Act. Based upon our evaluation, [Defendant Wood] and [Defendant Crowell] have concluded that, as of March 31, 2019, our disclosure controls and procedures are effective.

> *Changes in Internal Control over Financial Reporting.* There have not been any changes in our internal control over financial reporting that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, internal controls over financial reporting.

115.    Defendants Wood and Crowell's representations were materially false and misleading and failed to disclose material facts at the time they were made because, as set forth in Paragraph 95, Gulfport management, including Defendants Wood and Hicks, admitted that they did not effectively design and maintain controls over the completeness and accuracy of the accounting of transfers of unevaluated capitalized costs into the amortization base for the twelve month period ended December 31, 2019, which includes the quarter ended March 31, 2019. Specifically, Gulfport did not have an adequate process for monitoring that its accounting policies for transferring unevaluated oil and gas properties were consistently being performed timely and reconciled with the general ledger. As a result of this material weakness in internal control over financial reporting, Gulfport management, including Defendants Wood and Hicks, admitted that Gulfport did not maintain effective internal control over financial reporting as of December 31,

2019, and Grant Thornton issued an adverse opinion on Gulfport's internal control over financial reporting, as alleged in Paragraph 96. Furthermore, as set forth in Paragraph 97, Defendants Wood and Hicks admitted that, in stark contrast to their representation, that Gulfport's disclosure controls and procedures were not effective as of December 31, 2019 because of the material weakness in Gulfport's internal control over financial reporting described above.

116. Furthermore, the 1Q 2019 10-Q represented the following:

Our discussion and analysis of our financial condition and results of operations are based upon consolidated financial statements, which have been prepared in accordance with [GAAP].

117. Defendants Wood and Crowell's representations were materially false and misleading and failed to disclose material facts at the time they were made because as set forth in Paragraphs 95-97, the consolidated financial statements in the Q1 2019 10-Q were not prepared in accordance with the rules and regulations of the SEC. Specifically, Gulfport management, including Defendants Wood and Crowell, were responsible for establishing and maintaining a system of adequate internal controls over financial reporting as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act. Defendants Wood and Hicks have admitted that Gulfport had not effectively designed and maintained controls over the completeness and accuracy of the accounting of transfers of unevaluated capitalized costs into the amortization base for the twelve month period ended December 31, 2019, which included the quarter ended March 31, 2019. Accordingly, due to the material weakness in internal control over financial reporting, Defendants Wood and Crowell had no reasonable basis to represent that Gulfport's consolidated financial statements in the Q1 2019 10-Q were prepared in accordance with GAAP.

118. The 1Q 2019 10-Q incorporated by reference the risk factors disclosed in Gulfport's Annual Report on Form 10-K for the year ended December 31, 2018 filed with the SEC

on Form 10-K on February 28, 2019.

119.     Defendants Wood and Crowell's representations were materially false and misleading and failed to disclose material facts at the time they were made because Defendants Wood and Crowell failed to disclose a material risk that had already materialized and was then adversely affecting the Company's internal control over financial reporting.  Defendants failed to warn investors that Gulfport was, at that time, suffering from a material weakness in internal controls, that was then adversely affecting Gulfport's ability to report its financial condition and results of operations accurately and on a timely basis.  As set forth in Paragraph 95, Defendants Wood and Hicks have admitted that they had not effectively designed and maintained controls over the completeness and accuracy of the accounting of transfers of unevaluated capitalized costs into the amortization base for the twelve month period ended December 31, 2019, which included the quarter ended March 31, 2019.

120.     Moreover, Defendants Wood and Crowell appended SOX certifications as exhibits to the 1Q 2019 10-Q, which were signed by Defendants Wood and Crowell, that stated, in part, as follows:

> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.     The registrant's other certifying officer and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in the Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

121.    Defendants Wood and Crowell's representations were materially false and misleading and failed to disclose material facts at the time they were made because as set forth in Paragraphs 95 and 97, Defendants Wood and Hicks have admitted that at the time the Q1 2019 10-

Q was filed, they: 1) had not designed disclosure controls and procedures to ensure that material information relating to the Gulfport was made known to them; 2) they had not designed internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external disclosure to the SEC and investors in accordance with GAAP; 3) Gulfport's disclosure controls and procedures were not effective; 4) they failed to disclose the change in Gulfport's internal control over financial reporting that occurred by at least the quarter ended March 31, 2019 that materially, negatively affected Gulfport's internal control over financial reporting; 5) failed to disclose to Grant Thornton and to the audit committee of the Company's board of directors: (a) the material weaknesses in the design or operation of internal control over financial reporting that was adversely affecting Gulfport's ability to record, process, summarize and report financial information; and (b) failed to disclose any fraud, whether or not material, that involves Gulfport management or other employees who have a significant role in its internal controls over financial reporting; and 6) the Company's financial statements for the quarter ended March 31, 2019 were not prepared in accordance with GAAP.

> **B.** **Defendants Wood and Crowell Made Materially False and Misleading Statements, and Omitted to Disclose Material Facts That They Had a Duty to Disclose in Gulfport's Q2 2019 10-Q**

122.   Also on August 2, 2019, Defendants Wood and Crowell caused Gulfport to file the Q2 2019 10-Q that was signed by Defendant Crowell. The 2Q 2019 10-Q represented the following:

> As of June 30, 2019, an evaluation was performed under the supervision and with the participation of management, including [Defendant Wood] and [Defendant Crowell], of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rule 13a-15(b) under the Exchange Act. Based upon our evaluation, [Defendant Wood] and [Defendant Crowell] have concluded that, as of June 30, 2019, our disclosure controls and procedures are effective.

*Changes in Internal Control over Financial Reporting.* There have not been any changes in our internal control over financial reporting that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, internal controls over financial reporting.

123.    Defendants Wood and Crowell's representations were materially false and misleading and failed to disclose material facts at the time they were made with respect to the quarter ended June 30, 2019 for the reasons set forth in Paragraph 115.

124.    Defendants also appended SOX certifications as exhibits to the 2Q 2019 10-Q, signed by Defendants Wood and Crowell, that repeated the representations delineated in Paragraph 120 with respect to the quarter ended June 30, 2019.

125.    Defendants Wood and Crowell's representations were materially false and misleading and failed to disclose material facts at the time they were made with respect to the quarter ended June 30, 2019 for the reasons set forth in Paragraph 121.

126.    The 2Q 2019 10-Q represented the following:

As of June 30, 2019, there have been no significant changes in our critical accounting policies from those disclosed in our 2018 Annual Report on Form 10-K[, which stated "Our discussion and analysis of our financial condition and results of operations are based upon consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America, or GAAP."]

127.    Defendants Wood and Crowell's representations were materially false and misleading and failed to disclose material facts at the time they were made with respect to the quarter ended June 30, 2019 for the reasons set forth in Paragraph 117.

128.    The 2Q 2019 10-Q incorporated by reference the risk factors previously disclosed in Gulfport's Annual Report on Form 10-K for the year ended December 31, 2018 filed with the SEC on Form 10-K on February 28, 2019.

129.    Defendants Wood and Crowell's representations were materially false and

misleading and failed to disclose material facts at the time they were made with respect to the quarter ended June 30, 2019 for the reasons set forth in Paragraph 119.

130.    On August 9, 2019, Defendant Crowell resigned from her position as CFO with the Company.  The timing of her resignation was suspicious as it occurred during the third quarter ended September 30, 2019 during which Gulfport, among other things, materially understated the impairment of its oil and gas properties by over $500 million.  As a result of Crowell's resignation, she avoided having to sign and certify Gulfport's materially false and misleading financial results for the quarter ended September 30, 2019.

### C.    Defendants Wood and Hicks Made Materially False and Misleading Statements, and Omitted to Disclose Material Facts That They Had a Duty to Disclose Concerning Gulfport's Q3 2019 Financial Results

131.    On October 31, 2019, Defendants Wood and Hicks caused Gulfport to issue a press release reporting Gulfport's financial and operational results for the third quarter ended September 30, 2019 and providing an update on Gulfport's 2019 activities, which was filed with the SEC on Form 8-K (the "10/31/19 Press Release").  The 10/31/19 Press Release stated that for the three months ended September 30, 2019, Gulfport reported a net loss of $48.8 million or a loss of $0.31 per share, an impairment of oil and natural gas properties charge of $35.6 million, and depreciation, depletion and amortization of $145.5 million.  Furthermore, for the nine months ended September 30, 2019, Gulfport reported net income of $248.4 million or net income of $1.55 per share, an impairment of oil and natural gas properties charge of $35.6 million, and depreciation, depletion and amortization of $388.9 million.  Furthermore, the 10/31/19 Press Release reported in Gulfport's financial statements a carrying value of its oil and gas properties and equipment of $5,584,553,000.

132.    Defendants Wood and Hicks' representations were materially false and misleading and failed to disclose material facts at the time they were made because, as alleged in Paragraphs

30, 75-78, 85-86, in violation of GAAP, Defendants materially misstated and restated certain of Gulfport's financial results reported for the quarter ended September 30, 2019. Defendants Wood and Hicks have admitted that, in contrast to Gulfport's reported financial results for the three months ended September 30, 2019 outlined above, Gulfport's net loss was $484.8 million, or $3.04 per share, an understatement in net loss of $436 million or $2.73 per share—or by approximately 90%, Gulfport's impairment of oil and natural gas properties was $571.4 million, an understatement of impairment of oil and natural gas properties charge of $535.8 million—or by approximately 94%, and Gulfport's DD&A was $163.2 million, an understatement of $17.7 million—or by approximately 11%. Furthermore, for the nine months ended September 30, 2019, instead of net income, Gulfport had a net loss of $187.6 million or $1.17 per share, Gulfport's impairment of oil and natural gas properties was understated by approximately 94%, and Gulfport's DD&A was $406.7 million, an understatement of $17.8 million or by approximately 4.4%. Furthermore, as alleged in Paragraph 76, Gulfport's carrying value of its oil and gas properties and equipment reported in the 10/31/19 Press Release was overstated by over 10%.

133.    On November 1, 2019, Defendants Wood and Hicks hosted a conference call with investors and analysts concerning the Company's financial results for the quarter ended September 30, 2019 that referenced the 10/31/2019 Press Release and repeated that for the quarter ended September 30, 2019, Gulfport reported a net loss of $48.8 million or $0.31 per share.

134.    Defendants Wood and Hicks' representation concerning Gulfport's reported net loss was materially false and misleading at the time it was made for the same reasons as set forth in Paragraph 132.

135.    Also on November 1, 2019, Defendants Wood and Hicks caused Gulfport to file the Q3 2019 10-Q that was signed by Defendant Hicks. In the 3Q 2019 10-Q, Defendants repeated

the false representations alleged in Paragraph 131, which were materially false and misleading at the time they were made for the same reasons delineated above in Paragraph 132.

136.    The 3Q 2019 10-Q represented the following:

As of September 30, 2019, an evaluation was performed under the supervision and with the participation of management, including [Defendant Wood] and [Defendant Hicks], of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rule 13a-15(b) under the Exchange Act. Based upon our evaluation, [Defendant Wood] and [Defendant Hicks] have concluded that, as of September 30, 2019, our disclosure controls and procedures are effective.

*Changes in Internal Control over Financial Reporting*. There have not been any changes in our internal control over financial reporting that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, internal controls over financial reporting.

137.    Defendants Wood and Hicks' representations were materially false and misleading and failed to disclose material facts at the time they were made because, as alleged in Paragraphs 71-78, 91, 95, and 97, Defendants Wood and Hicks have admitted that for the quarter ended September 30, 2019, Gulfport's internal control over financial reporting suffered from a material weakness, and Gulfport's disclosure controls and procedures for the quarter ended September 30, 2019 were not effective due to the material weakness in internal control over financial reporting alleged above.

138.    The 3Q 2019 10-Q made the following representations:

As of September 30, 2019, there have been no significant changes in our critical accounting policies from those disclosed in our 2018 Annual Report on Form 10-K[, which stated "Our discussion and analysis of our financial condition and results of operations are based upon consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America, or GAAP."]

139.    Defendants Wood and Hicks' representations were materially false and misleading and failed to disclose material facts at the time they were made because Gulfport's financial statements for the quarter ended September 30, 2019 were not prepared in accordance with GAAP

for the reasons set forth in Paragraphs 71-82, 85-86.

140.     Moreover, Defendants Wood and Hicks appended SOX certifications as exhibits to the 3Q 2019 10-Q, signed by Defendants Wood and Hicks, that repeated the representations delineated above in Paragraphs 120 with respect to the quarter ended September 30, 2019.

141.     Defendants Wood and Hicks' representations were materially false and misleading and failed to disclose material facts at the time they were made because, as alleged in Paragraphs 71-74, 91, 94-97, Defendants Wood and Hicks have admitted that they: 1) had not designed disclosure controls and procedures to ensure that material information relating to the Gulfport was made known to them; 2) had not designed internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external disclosure to the SEC and investors in accordance with GAAP; 3) Gulfport's disclosure controls and procedures were not effective; 4) they failed to disclose the change in Gulfport's internal control over financial reporting that occurred during the quarter ended September 30, 2019 that materially affected Gulfport's internal control over financial reporting; 5) failed to disclose to Grant Thornton and to the audit committee of the Company's board of directors: (a) the material weaknesses in the design or operation of internal control over financial reporting that was adversely affecting Gulfport's ability to record, process, summarize and report financial information; and (b) failed to disclose any fraud, whether or not material, that involves Gulfport management or other employees who have a significant role in its internal controls over financial reporting; and 6) the Company's financial statements for the quarter ended September 30, 2019 were materially misstated, requiring a restatement, and were not prepared in accordance with GAAP.

142.     The 3Q 2019 10-Q incorporated by reference the risk factors previously disclosed

43

in Gulfport's Annual Report on Form 10-K for the year ended December 31, 2018 filed with the SEC on Form 10-K on February 28, 2019.

143.    Defendants Wood and Hicks' representations were materially false and misleading and failed to disclose material facts at the time they were made because, as alleged in Paragraph 92-93, they failed to disclose the risk that Gulfport's internal control over financial reporting suffered from a material weaknesses that had and continued to have an adverse effect on Gulfport's financial reporting.

144.    The 3Q 2019 10-Q's MD&A section concerning "Result of Operations" represented the following:

**Comparison of the Three Month Periods Ended September 30, 2019 and 2018**

[Gulfport] reported net loss of $48.8 million for the three months ended September 30, 2019 as compared to net income of $95.2 million for the three months ended September 30, 2018. This $144.0 million period-to-period decrease was due primarily to a $75.8 million decrease in oil and natural gas revenues, a $55.9 million increase in loss from equity method investments, including a $35.5 million impairment related to our investment in Mammoth Energy, a $35.6 million oil and natural gas properties impairment charge related to the decline in commodity prices, a $25.6 million increase in DD&A and a $2.7 million decrease in gain on sale of equity method investments, partially offset by a $23.6 million gain on debt extinguishment and a $26.5 million increase in income tax benefit for the three months ended September 30, 2019 as compared to the three months ended September 30, 2018.

\*\*\*

**Comparison of the Nine Month Periods Ended September 30, 2019 and 2018**

We reported net income of $248.4 million for the nine months ended September 30, 2019 as compared to net income of $296.6 million for the nine months ended September 30, 2018. This $48.2 million period-to-period decrease was due primarily to a $199.7 million increase in loss from equity method investments, including a $160.8 million impairment related to our investment in Mammoth Energy, a $124.8 million decrease in gain on sale of equity method investments, a $35.6 million oil and natural gas properties impairment charge related to the decline in commodity prices, a $36.1 million increase in DD&A and a $6.2 million increase in midstream gathering and processing expenses, partially offset by a $205.8 million increase in income tax benefit, a $125.7 million increase in natural gas, oil

and NGL revenues and a $23.6 million increase in gain on debt extinguishment for the nine months ended September 30, 2019 as compared to the nine months ended September 30, 2018.

145.    Defendants Wood and Hicks' representations were materially false and misleading and failed to disclose material information at the time they were made in violation of Item 303, as alleged above in Paragraphs 87-90.

146.    On November 18, 2019, Gulfport filed a report on From 8-K with the SEC that stated that two of its Board members, Craig Groeschel and Scott E. Streller, would step down from the Board by year-end, and that the Chairman of the Board, David L. Houston, decided not to seek re-election at the Company's 2020 annual meeting.  Gulfport further disclosed a 13% reduction in employee headcount.

147.    On November 20, 2019, Gulfport filed a report with the SEC on Form 8-K that stated the Company accepted the retirement notice of Stuart Maier, the Senior Vice President of Geosciences, from his position with the Company, effective as of December 20, 2019.

### D.    The Truth Begins to Emerge

148.    On  February 27, 2020, during after-market hours, Defendants Wood and Hicks caused Gulfport to disclose the truth about Gulfport's true financial condition, as alleged above in Paragraphs 26-31.  On February 28, 2020, Gulfport's stock price fell from a closing price on February 27, 2020 of $0.90 per share, to an intraday low of $0.50 per share—a decline of over 44% per share—to close at $0.82 per share, a one-day decline of $0.08 per share, or 8.89%, on heavier than usual volume of over 25 million shares traded.  The next trading day, Gulfport shares declined at additional $0.17 per share, or approximately 21%, to close at $0.65 per share on March 2, 2020, on heavier than usual volume of over 10 million shares traded.  In total, over the course of two trading days, Gulfport shares declined by $0.25 per share, or approximately  27%, on volume of over 35 million shares.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

149.     During the Class Period, as detailed herein, Defendants, knowingly or at least recklessly, engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Gulfport's securities and operated as a fraud or deceit on Class Period purchasers of Gulfport securities by misrepresenting the Company's operating condition and future business prospects.  Defendants achieved this by making positive statements about Gulfport's internal controls, financial results and risks to Gulfport's business while they knew, or recklessly disregarded, that their representations were materially false and misleading.

150.     Later, however, when the falsity of Defendants' misrepresentations materialized and became apparent to the market, the price of Gulfport's securities fell precipitously as the prior artificial inflation came out of the price of Gulfport's securities.  As a result of their purchases of Gulfport's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

151.     As a direct result of the public revelations regarding the truth about the condition of Gulfport's business and the negative adverse factors that had been impacting Gulfport's business during the Class Period, the price of Gulfport's securities materially declined.  These stock drops removed the inflation from the price of Gulfport's securities, causing real economic loss to investors who purchased Gulfport's securities during the Class Period.

152.     The timing and magnitude of declines in the price of Gulfport securities negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## IX.     ADDITIONAL SCIENTER ALLEGATIONS

153.      Based on both the facts alleged above and in this section, Defendants acted with

scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  By virtue of their receipt of information reflecting the true facts regarding Gulfport, Defendants participated in the fraudulent scheme alleged herein.

154.    Defendants knew, or at least recklessly disregarded, the false and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme alleged in the Action could not have been perpetrated over a substantial period, as has occurred, without the knowledge, or recklessness disregard, and complicity of the personnel at the highest level of the Company, including the Defendants.

**A.    Defendants Turned a Blind Eye to Red Flags, Which Supports an Inference of Scienter**

155.    During the Class Period, Defendants caused Gulfport's financial statements to report in excess of $10 billion of costs incurred for oil and gas properties, by far the most significant asset on Gulfport's balance sheet.  Even on a net basis, after deducting for depletion, amortization and impairment costs, the oil and gas costs were approximately $5.0 billion, before the $2.04 billion impairments recorded by the Company during 2019 (third quarter-restatement and fourth quarter).

156.    Again, the reported amount of net oil and gas properties before the impairment charges recorded in 2019, were the most significant and critical assets included in Gulfport's financial statements by twenty fold.  Accordingly, Defendants focused on their reporting of Gulfport's valuation on its oil and gas properties, at least, on a quarterly basis, and investor focus

was on the reported value of Gulfport's oil and gas properties.

157.    Defendants' quarterly ceiling tests were critical in 2019 because throughout the year commodity prices were volatile and there were significant declines in commodity prices.  Of particular importance to Gulfport was the decline in natural gas prices on the Henry Hub, a key price benchmark for natural gas futures on the New York Mercantile Exchange. The settlement prices at Henry Hub are used as benchmarks for the entire North American natural gas market and parts of the global NGL market, and were followed by Defendants.

158.    Henry Hub prices dramatically declined in 2019 from prices at the end of 2018, and by approximately 35% by the start of the Class Period, as depicted in the chart below:



159.    Given that the substantial decline in natural gas prices negatively affected the estimated future revenue from Gulfport's natural gas properties, which comprised 97-98% of Gulfport's production, Defendants were on notice that there was a high risk for a substantial impairment to the carrying value of Gulfport's oil and gas properties, and therefore the ceiling test was Defendants' most critical accounting function.  Indeed, as a result of the decline in commodity prices in the past, Gulfport recognized a massive ceiling test impairment of $715.5 million for the

year ended December 31, 2016.

160.    Defendants, knowing that the reported amount of Gulfport's oil and gas properties was the most significant and critical asset on its balance sheet and that the decline in commodity prices created a significant risk of impairment of those assets, Defendants knowingly, or at least recklessly, failed to disclose that Gulfport's oil and gas assets were impaired for at least the quarter ended September 30, 2019 by over $500 million.

161.    Defendants failed to reconcile the cost of oil and gas properties used in preparing the ceiling test analysis to the amounts recorded in Gulfport's general ledger (the source accounting book and record used to prepare its financial statements, and a basic accounting procedure of reconciling accounts) causing it to materially report false and misleading financial results for at least the quarter ended September 30, 2019.

162.    The reconciliation of supporting records to the general ledger is a process that is taught to students in introductory accounting courses.  It is not a sophisticated, complex concept or process.  Having failed to perform this most basic accounting process in a declining commodity market in connection with their quarterly ceiling tests, Defendants conduct, or failure to act, was an extreme departure from the ordinary standard of care.

163.    Defendants dissemination of the September 30, 2019 financial statements was intentional, or at least reckless, given all the forgoing red flags known to Defendants.

**B.      Gulfport and Defendant Crowell's Other False Statements to Investors, Accounting Violations and Deficiencies in Internal Control over Financial Reporting Support an Inference of Scienter**

164.    Gulfport and Defendant Crowell have engaged in accounting violations that caused the SEC to issue an Order Instituting Cease-and-Desist Proceedings Pursuant To Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing A Cease-and-Desist Order. In the Matter of Gulfport Energy Corporation, Administrative Proceeding File No. 3-20232 (dated

February 24, 2021) (the "Cease and Desist Order").  The SEC's findings that Defendant Crowell turned a blind eye to the accounting and financial statement fraud alleged below gives rise to a strong inference that during the Class Period Defendant Crowell engaged in substantially similar conduct during the Class Period and was aware of, or at least recklessly disregarded, Gulfport's defective internal controls that negatively affect the completeness and accuracy of transferring costs for unevaluated oil and gas properties in violation of GAAP.

165.    The Cease and Desist Order stemmed from Gulfport's failure to disclose certain perquisites and related person transactions concerning Gulfport's former CEO, Michael G. Moore ("Moore") during the time from 2014 until he resigned in October 2018.

166.    During the period from 2014 through October 2018, Defendant Crowell served as Gulfport's CFO, and other senior accounting positions at the Company, as alleged above in Paragraph 42.

167.    According to the Cease and Desist Order, in violation of the Company's policy that Company assets be used for legitimate business purposes, Moore used his company credit card for significant personal purchases that were not related to Gulfport's business.  Moore identified his personal charges for Gulfport on a monthly basis, but despite its policy, and Defendant Crowell and Gulfport's finance department being aware of these charges, Gulfport did not require Moore to repay these expenses to the company when due. Instead, Gulfport paid the company credit card bill at the end of each month and routinely allowed Moore to defer repayment. The finance department, along with Defendant Crowell, was aware of this. As a result, Gulfport regularly carried an account receivable from Moore regarding his personal use of his company credit card. The receivable often ballooned throughout the year, with Moore repaying the interest-free credit Gulfport extended by year-end. In 2017, for example, the receivable climbed to more than

$336,000 without any payments over eight months before Moore extinguished the debt four days prior to the end of the year.

168.     According to the Cease and Desist Order, Gulfport violated Section 13(b)(2)(A) of the Exchange Act, which requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the issuer's transactions and dispositions of assets, and Section 13(b)(2)(B) of the Exchange Act, which requires reporting companies to devise and maintain a system of internal accounting controls sufficient to, among other things, provide reasonable assurances that transactions are executed in accordance with management's general or specific authorization and are recorded as necessary to maintain accountability for assets, and that access to assets is permitted only in accordance with management's general or specific authorization. As a result of the conduct described above, Gulfport violated Section 13(b)(2)(B) of the Exchange Act by failing to implement sufficient internal accounting controls concerning perquisites and related person transactions.

**C.     Defendants Had Motive and Opportunity to Conceal Gulfport's Deficiencies in Internal Control over Financial Reporting and to Issue False Financial Reports**

169.     Defendants had the opportunity to perpetrate the fraudulent scheme and course of business described herein because, as alleged above in Paragraphs 41-44, they were the most senior officers of Gulfport, issued statements and press releases on behalf of Gulfport, or signed SEC filings on behalf of Gulfport or caused them to be filed with the SEC.

170.     As alleged above in Paragraphs 5-7, 98-112, Defendants had a concrete and personal motive to commit fraud.  In light of the pressure exerted by shareholders Firefly and Shah Capital on Gulfport's board, Defendants and management to improve Gulfport's stock performance, Defendants were motivated to conceal Gulfport's material weakness in internal control over financial reporting and its negative effect on Gulfport's financial statements in order

to maintain the artificial inflation in Gulfport's stock price, and protect themselves from further shareholder scrutiny.

## X.    NO SAFE HARBOR

171.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

172.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Gulfport who knew that those statements were false when made.

## XI.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

173.    Plaintiff brings the Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Gulfport securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

174.    The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, Gulfport securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Gulfport or its transfer agent and may be notified of the pendency of the Action by mail, using the form of notice similar to that customarily used in securities class actions. As of February 14, 2020, Gulfport reported over 159 million shares outstanding.

175.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

176.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

177.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Gulfport;

- whether the Defendants caused Gulfport to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Gulfport securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

178.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of the Action as a class action.

179.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Gulfport securities traded in an efficient market during the Class Period;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Gulfport securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

180.    At all relevant times, the market for Gulfport's common stock was an efficient market for the following reasons, among others:

(a)      The Company's common stock met the requirements for public listing and was listed and actively traded on the Nasdaq, a highly efficient market;

(b)      As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)      The Company regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace; and

(d)      A number of securities analysts regularly followed and analyzed the Company, and issued reports concerning the Company.

181.    As a result, the market for the Company's publicly traded common stock promptly digested current information with respect to Gulfport from all publicly available sources and reflected such information in the price of the Company's common stock.

182.    Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the publicly traded common stock of Gulfport at artificially inflated prices and a presumption of reliance applies.

183.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

184.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

185.    This Count is asserted against Defendants and is based upon Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

186.     During the Class Period, Gulfport and Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Gulfport securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Gulfport securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

187.     Pursuant to the above plan, scheme, conspiracy and course of conduct, Gulfport and each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Gulfport securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Gulfport's finances and business prospects.

188.     By virtue of their positions at Gulfport, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants

acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were available to Defendants. The alleged acts and omissions of Gulfport and Defendants were committed willfully or with reckless disregard for the truth. In addition, Gulfport and each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

189.    Information showing that Gulfport and Defendants acted knowingly or with reckless disregard for the truth is within Defendants' knowledge and control. As the senior managers and/or directors of Gulfport, Defendants had knowledge of the details of Gulfport's internal affairs.

190.    The Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Defendants were able to and did, directly or indirectly, control the content of the statements of Gulfport.  As senior officers or directors of a publicly-held company, the Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Gulfport's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Gulfport securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Gulfport's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Gulfport securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

191.    During the Class Period, Gulfport securities were traded on an active and efficient

market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Gulfport and Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Gulfport securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Gulfport securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Gulfport securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

192.    By reason of the conduct alleged herein, Gulfport and Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

193.    As a direct and proximate result of Gulfport and Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
### (Violations of Section 20(a) of the Exchange Act Against All Defendants)

194.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

195.    During the Class Period, Defendants participated in the operation and management of Gulfport, and conducted and participated, directly and indirectly, in the conduct

of Gulfport's business affairs. Because of their senior positions, they knew the adverse non-public information about Gulfport's misstatement of income and expenses and false financial statements.

196.    As officers and/or directors of a publicly owned company, Defendants had a duty to disseminate accurate and truthful information with respect to Gulfport's financial condition and results of operations, and to correct promptly any public statements issued by Gulfport which had become materially false or misleading.

197.    Because of their positions of control and authority as senior officers and members of Gulfport's management team, Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Gulfport disseminated in the marketplace during the Class Period concerning Gulfport's results of operations.

198.    Throughout the Class Period, Defendants exercised their power and authority to cause Gulfport to engage in the wrongful acts complained of herein.

199.    Each of the Defendants, therefore, acted as a controlling person of Gulfport. By reason of their senior management positions and/or being directors of Gulfport, each of Defendants had the power to direct the actions of, and exercised the same to cause, Gulfport to engage in the unlawful acts and conduct complained of herein. Each of the Defendants exercised control over the general operations of Gulfport and possessed the power to control the specific activities which comprise the primary violations by Gulfport about which Plaintiff and the other members of the Class complain.

200.    Defendants, therefore, were "controlling persons" of Gulfport within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Gulfport securities.

201.    By reason of the above conduct, the Defendants are liable pursuant to Section

20(a) of the Exchange Act for the violations of Section 10(b) of the Exchange Act and Rule 10b-5 committed by Gulfport as alleged in the Action.

## XII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## XIII.   DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  July 7, 2021                              Respectfully submitted,

                                                  */s/   Jeffrey P. Campisi*
                                                  Frederic S. Fox
                                                  Donald R. Hall
                                                  Jeffrey P. Campisi
                                                  Pamela A. Mayer
                                                  Jason A. Uris
                                                  **KAPLAN FOX & KILSHEIMER LLP**
                                                  850 Third Avenue, 14th Floor
                                                  New York, NY 10022
                                                  Telephone: (212) 687-1980
                                                  Email: ffox@kaplanfox.com
                                                          dhall@kaplanfox.com
                                                          jcampisi@kaplanfox.com
                                                          pmayer@kaplanfox.com
                                                          juris@kaplanfox.com

                                                  *Lead Counsel for Lead Plaintiff and the
                                                  Proposed Class*